UNITED STATES of America,
Plaintiff–Appellee,

v.

Elton J. CARTER; James Arthur
Stone; Antonio G. Smith,
Defendant–Appellants.

Nos. 00–5855, 00–5879, 00–5888.

United States Court of Appeals,
Sixth Circuit.

Aug. 15, 2002.

340

Before KRUPANSKY and COLE, Circuit Judges; and DUGGAN, District Judge.*

## OPINION

COLE, Circuit Judge.

This action stems from a police stop of a van in Lexington, Kentucky that led officers to a local hotel and over sixty grams of cocaine base. The defendants, Elton Carter, Antonio Smith, and James Stone argue that their Fourth Amendment rights were violated in the search of the van and the hotel room, that their Fifth Amendment right to remain silent was violated at interrogation and at trial, that their Sixth Amendment right to trial by jury was violated when the jury did not decide the amount of drugs involved for each count of the indictment, and that the district court erred by making the entire drug quantity attributable to each defendant at sentencing. Defendants now appeal from their respective convictions and sentences under 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 2.

This appeal presents six issues for our review: (1) whether the district court properly admitted evidence under the Fourth Amendment from the officers' stop and search of Stone and Smith's van; (2) whether the district court properly determined under the Fourth Amendment that defendants had consented to the officers' search of the hotel room; (3) whether the district court properly determined that the evidence was sufficient to support Carter's and Smith's drug convictions; (4)

of Michigan, sitting by designation.

whether the district court properly determined under the Fifth Amendment that the prosecutor did not improperly comment on Carter's, Smith's, and Stone's decision to remain silent; (5) whether the district court properly sentenced Carter, Smith, and Stone in accord with the mandate of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), where the jury was not permitted to decide the amount of drugs named in each count of the indictment; and 6) whether the district court properly found that Carter and Smith were responsible for more than sixty grams of cocaine base. We find no error with respect to these claims, and **AFFIRM** the judgment of the district court.

## BACKGROUND

### A. Factual Background

Just after 1 a.m. on October 11, 1999, Sergeant Greg Jennings and Detective Jack Dawson observed a blue Chevrolet van with Michigan license plates pass at a rapid speed and stop abruptly at the stoplight at the intersection of Russell Cave Road and New Circle Road in Lexington, Kentucky. The two Lexington–Fayette Urban County police officers were in an unmarked police truck and followed the van on New Circle Road. The officers later testified that the van was exceeding the speed limit by ten miles per hour as it traveled west on New Circle Road. The van then turned left onto Georgetown Road, made a U-turn by pulling into a side parking lot, and continued in the opposite direction on Georgetown Road past the two officers. The van then turned left on Roosevelt Avenue, a cul-de-sac in what is described as a low-income neighborhood. The two officers did not follow the van into the cul-de-sac, but instead waited in a parking lot for the van to re-emerge.

From their position, the officers could not see anyone exit the van during this period.

Approximately five to ten minutes later, the van re-emerged from the cul-de-sac and turned right onto Georgetown Road. At trial, the officers testified that the van crowded and crossed the yellow line in the center of the road, and was speeding "at least ten miles per hour above the posted speed limit of thirty-five miles per hour." The officers followed the van to downtown Lexington, and then pulled it over at the intersection of Elm and Sixth Streets. Three people were inside the van: James Stone was driving, and Lia Hicks and Yolanda Parker were passengers. The officers testified that Stone smelled of alcohol, and administered three field sobriety tests. Stone passed two objective tests, but did not pass a subjectively-judged sobriety test. Stone then agreed to take a preliminary breath test, which showed a blood alcohol level of 0.090, below the drunk driving limit in Kentucky of 0.100. Sergeant Jennings then arrested Stone for reckless driving under state law.

Pursuant to the arrest, the officers conducted a search of Stone's person. In the course of this search, the officers recovered a room key to a local Days Inn hotel. In addition, a narcotics-detection dog alerted to the scent of narcotics in the van, which precipitated a full search of the van. Inside the van, the officers discovered a compact containing cocaine residue and marijuana stems on the floor of the vehicle. The officers decided to tow the van, detain Hicks and Parker at the site of the traffic stop, and transport Stone to the jail. After Parker noted that the group was staying at the Days Inn with someone named "E," the officers decided to investigate the room number indicated on the hotel key found on Stone.

The officers arrived at the Days Inn just after 2 a.m. Sergeant Jennings and Detec-

tive Dawson were informed by the desk clerk that room 264, the room indicated on the key obtained from Stone, was registered in the name of John Carter. Officer David Straub knocked on the door, identified himself as a police officer, and asked Raymond Williams—the man who answered the door—if he owned a blue Chevrolet van. Williams replied that he did not, but Antonio Smith—another occupant of the room—spoke up and stated that he was the owner of the van. Officer Straub then asked permission to enter the room; Williams "probably" said yes, opened the door further, and stepped aside for the officers to enter.[1] Officer Straub later testified that neither Carter nor Smith objected when he entered the room.

Inside the room were Smith, Williams, and Elton Carter. After Officer Straub received permission, he, Jennings, Dawson, and Officer Brian Roberts entered the hotel room. Officer Dawson then asked Smith to follow him outside the room and answer some questions about the van. Meanwhile, the other officers questioned Carter and Williams. During the questioning, the officers claim they observed in "plain view" digital scales, plastic baggies, a cigar blunt, and other drug paraphernalia. The officers also claim that they then advised each defendant of their *Miranda* rights.[2]

In Carter's presence, Jennings suggested to Dawson that they should "freeze" the scene and obtain a search warrant. Dawson disagreed, and Jennings instead asked

Carter to sign a statement authorizing a search of the room, written on the back of a napkin. During the course of the ensuing search, the officers found sixty grams of cocaine base and $2,310 in cash. Carter, Williams, and Smith were immediately arrested, and Parker and Hicks were arrested when they returned from the scene of the traffic stop.

At trial, the officers testified that they found cocaine base in multiple places during their search of the hotel room. They found cocaine base in the pockets of a jacket hanging in the closet, four baggies of cocaine base in a pillow on one bed, and two baggies of cocaine base under the mattress of the other bed.

## B. Procedural History

Carter, Smith, and Stone were indicted in a five-count indictment on January 6, 2000 by a federal grand jury in Lexington, Kentucky. Count one of the indictment charged conspiracy to distribute in excess of fifty grams of cocaine base. Count two charged that defendants knowingly and intentionally possessed with intent to distribute the sixty grams of cocaine base, and count three charged that defendants aided and abetted one another to intentionally possess' with the intent to distribute the cocaine base.[3] All three defendants entered pleas of not guilty. Before trial, the three defendants filed motions to suppress the evidence obtained from the van and the hotel room. The district court conducted a hearing, and found that as to the

---

1. Defendants deny that Williams gave permission to enter, or opened the door further to allow entrance. Moreover, Williams also denies that the police ever asked for permission to enter the room. In fact, Williams testified that Officer Straub had pushed the door open. However, at the suppression hearing, Williams ultimately admitted that he "probably" had consented to Officer Straub's request to enter the room and talk to Smith.

2. Defendants contest this point, claiming that they were never given their *Miranda* rights.

3. Count four was against two female defendants not before us on appeal, and count five was a forfeiture count for property.

van, a traffic violation had occurred and the van had been properly stopped. Moreover, the district court found that the search was valid as an incident to Stone's arrest, and that the items found during the search of the van were lawfully discovered. The district court also concluded in a memorandum opinion that the evidence obtained from the hotel room should not be suppressed, because the government had sustained its burden of proving that Williams had apparent authority to consent to Straub's request to enter the room, and that both Williams's and Carter's consent was voluntarily given. As such, the district court concluded that the warrantless search of the hotel room was consistent with the Fourth Amendment.

With neither the van nor hotel evidence suppressed, the case proceeded to trial on March 13, 2000. During trial, the prosecutor made several off-hand references to the defendants' decision to remain silent and not testify, and on one occasion was rebuked by the district judge for doing so. The jury reached guilty verdicts as follows: Carter was convicted on counts one and three; Stone was convicted on counts one, two, and three; and Smith was convicted on count three. The jury returned not guilty verdicts as follows: Carter was acquitted on count two, Smith was acquitted on counts one and two, and Williams[4] was acquitted of all charges.

The Pre–Sentence Investigation Report ("PSR") recommended that all three defendants be sentenced based on the total amount of drugs that were found in the hotel room—sixty grams. The district court sentenced Carter to 240 concurrent months of imprisonment on counts one and three, Smith to 121 months of imprisonment on count three, and Stone to life imprisonment on counts one, two, and three.

4. Williams' case is not before us on appeal.

The three defendants filed timely notices of appeal: Carter filed his appeal on June 23, 2000; Stone filed his appeal on June 27, 2000, and Smith filed his appeal on June 29, 2000.

## DISCUSSION

**A. Whether the district court properly denied defendants' motion to suppress.**

### 1. STANDARD OF REVIEW

We review *de novo* a district court's legal conclusions on a motion to suppress, and its factual findings for clear error. *United States v. Salgado,* 250 F.3d 438, 455 (6th Cir.2001); *United States v. Adu,* 82 F.3d 119, 124 (6th Cir.1996). We consider the evidence in the light most likely to support the district court's ruling. *Salgado,* 250 F.3d at 455 (citing *United States v. Williams,* 962 F.2d 1218, 1221 (6th Cir. 1992)).

### 2. ANALYSIS

**a. Whether the district court properly admitted evidence under the Fourth Amendment from the officers' stop and search of Stone and Smith's van.**

Smith and Stone argue that the stop of the van was pretextual and that the subsequent warrantless search of the vehicle violated the Fourth Amendment to the United States Constitution. The Fourth Amendment provides that an officer's stop of a vehicle is reasonable where there is probable cause to believe that a traffic violation has occurred. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). This determination is fact-dependent and turns upon what the officer knew at the time of the

stop. *United States v. Johnson,* 242 F.3d 707, 709 (6th Cir.2001). A lawful custodial arrest of a person once they have been pulled over justifies a contemporaneous warrantless search of the person arrested, as well as of the immediately surrounding area. *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). This immediately surrounding area includes the passenger compartment of an automobile. *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Probable cause to conduct a warrantless search of a stopped vehicle may also be established when a narcotics-detection dog alerts to the smell of drugs in a vehicle. *United States v. Hill,* 195 F.3d 258, 273 (6th Cir.1999).

■ Here, the record reflects that Officers Jennings and Dawson observed Smith and Stone commit a multitude of traffic violations. Although the two defendants contend they were pulled over solely because they had out-of-state plates and were visiting a low-income neighborhood, Jennings and Dawson testified that a number of traffic violations were committed—speeding, a U-turn, erratic driving, and crossing the center line. These violations are a constitutionally permitted basis for a lawful stop under the Fourth Amendment. *Johnson,* 242 F.3d at 709. Moreover, Stone was lawfully arrested for reckless driving under the applicable Kentucky statute. *See* KY. REV. STAT. § 189.290 (Michie 1997). Once the lawful arrest was made, the officer was justified in searching Stone and the contents of the van pursuant to the arrest. *Belton,* 453 U.S. at 460. The dog's indication that drugs were present inside the van only provided a further factual basis for probable cause to conduct a warrantless search. *See Hill,* 195 F.3d at 273. Smith and Stone fail to establish that the stop of the van was pretextual and that the subsequent warrantless search of the vehicle violates the Fourth Amendment.

Accordingly, we affirm the district court's decision to deny defendants' motion to suppress the evidence from the search of Stone and the contents of the van.

**b. Whether the district court properly determined under the Fourth Amendment that defendants had consented to the officers' search of the hotel room.**

The defendants argue that they had a reasonable expectation of privacy in their hotel room, that the initial search of and entry into the room were unlawful, and that Carter's subsequent consent was involuntary. The Fourth Amendment creates a subjective privacy expectation for an overnight guest. *Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). This privacy expectation extends to hotel rooms. *See United States v. Allen,* 106 F.3d 695, 698 (6th Cir.1997) (citing *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)). However, the prohibition against warrantless searches does not apply where voluntary consent to search is given. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Reeves,* 594 F.2d 536, 539 (6th Cir.1979). Even when the owner of the premises does not himself give consent, a good faith belief by the police that the person giving consent has common authority over the premises is sufficient to allow the search. *Illinois v. Rodriguez,* 497 U.S. 177, 186–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Hall,* 979 F.2d 77, 79 (6th Cir.1992). This consent must be given prior to the time that a warrantless search begins. *United States v. Kelly,* 913 F.2d 261, 265 (6th Cir.1990); *United States v. Jones,* 641 F.2d 425, 429 (6th Cir.1981). The burden of proof in

showing that consent was given lies with the government. *Schneckloth,* 412 U.S. at 248. The fruits of an illegal search, where consent was not given, should be suppressed. *United States v. Buchanan,* 904 F.2d 349, 356 (6th Cir.1990).

█ While defendants did have a reasonable expectation of privacy in their hotel room, that expectation was relinquished when they consented to the officers' request to enter and later search the room. *See Schneckloth,* 412 U.S. at 219; *Reeves,* 594 F.2d at 539. Williams ultimately admitted that he "probably" had consented to Officer Straub's request to enter the room and talk with Smith, and Carter signed a statement of consent under no apparent coercion. The district court carefully considered whether consent was given, and found that it was "reasonable for the officers to conclude that Williams had authority to consent to their request to enter room # 264." *Hall,* 979 F.2d 77. Moreover, it found that under the totality of the circumstances, Carter's written consent to the search of the hotel room and Williams's oral consent to enter the room were voluntarily given. *Id.* This finding of fact by the district court survives our clear error review, *see Bueno,* 21 F.3d at 126, and allows the fruits of this search into evidence. *Buchanan,* 904 F.2d at 356.

Accordingly, we affirm the district court's decision not to suppress the evidence taken from the search of the hotel room.

**B. Whether the district court properly determined that the evidence was sufficient to support Carter's and Smith's drug convictions.**

### 1. STANDARD OF REVIEW

A denial of a FED. R. CRIM. P. 29(c) motion for judgment of acquittal is reviewed *de novo. See United States v.* *Canan,* 48 F.3d 954, 962 (6th Cir.1995). However, the decision of the district court must be affirmed if the evidence, viewed in a light most favorable to the government, "would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.* (citing *United States v. Montgomery,* 980 F.2d 388, 393 (6th Cir.1992)).

### 2. ANALYSIS

Carter and Smith argue that there was insufficient evidence to support their convictions, and that the district court should have granted their Rule 29(c) motion for judgment of acquittal. In meeting the elements of 21 U.S.C. §§ 841 and 846 for possession with intent to distribute, and conspiracy to possess with intent to distribute a controlled substance, circumstantial and direct evidence are accorded the same weight. *United States v. Blakeney,* 942 F.2d 1001, 1010 (6th Cir.1991).

█ Carter and Smith reason that the evidence introduced at trial only demonstrated that they were associated with those who had broken the law. They claim that the United States failed to demonstrate any direct evidence that connected them to the drugs or money found in the hotel room. However, it is in the jury's discretion to infer that the defendant constructively possessed contraband found in his living quarters regardless of whether there was proof of actual possession. *Hill,* 142 F.3d at 311–12. Here, no evidence shows that either Carter or Smith was in the room for a short period of time. Considerable drug paraphernalia was present in the hotel room—consistent with a professional operation. The drugs were packaged for distribution, the money present indicates that drug sales had already occurred, and the hotel records indicate that defendants had made numerous trips to Lexington. Taken together, this evidence is enough for the jury to infer

that Carter and Smith were involved in the possession with intent to distribute drugs consistent for conviction under 21 U.S.C. §§ 841 and 846.

Accordingly, we affirm the district court's decision to deny defendants' Rule 29(c) motion for judgment of acquittal.

**C. Whether the district court properly determined under the Fifth Amendment that the prosecutor did not improperly comment on Carter's, Smith's, and Stone's decision to remain silent.**

### 1. STANDARD OF REVIEW

The question of whether a prosecutor's conduct amounts to prosecutorial misconduct, and whether it rendered the trial fundamentally unfair, are mixed questions of law and fact that are reviewed *de novo*. *See United States v. Francis*, 170 F.3d 546, 549 (6th Cir.1999). When there is no objection at trial, the alleged improper conduct is reviewed for plain error. *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir.1994).

### 2. ANALYSIS

Defendants argue that the prosecutor's decision to comment on their silence at arrest, their failure to present evidence, and their failure to testify in their own defense violates their rights against self-incrimination under the Fifth Amendment. A defendant's Fifth Amendment rights are violated when a prosecutor is permitted to use against him his choice to remain silent at trial. *Griffin v. California*, 380 U.S. 609, 613, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Post-arrest silence also may not be used against a defendant at trial in order to imply guilt from that silence. *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Pre-arrest silence also may not be used as substantive evidence of guilt, and will be admitted at

trial only for impeachment purposes. *See Combs v. Coyle*, 205 F.3d 269, 281–83 (6th Cir.2000); *see also Brecht v. Abrahamson*, 507 U.S. 619, 628, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). As such, the use of an accused's pre-arrest silence is "not a legitimate governmental practice." *Combs*, 205 F.3d at 285. However, a conviction will not be overturned without viewing the prosecutor's comments in the context of the entire trial. *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir.1996).

The defendants cite the following examples of prosecutorial misconduct:

**During Officer Straub's testimony:**

Q. When the officers found the crack, was there any reaction from any of the individuals in the room?

A. Not that I can recall. I really wasn't paying attention to their reactions. There wasn't any outcry of, you know, anybody disclaiming anything.

**During Detective Dawson's testimony:**

Q. Okay. When the drugs were found, what was the response of any of the defendants? What was their reaction?

A. A little disheartened, that's how I would characterize it.

Q. Why do you say that?

A. It's not the reaction that I had expected from someone who didn't know anything about drugs.

Nash: Objection, your Honor.

Griffin: Objection.

Court: Overruled.

Q. Now, did anyone, at that time, indicate that the drugs were not theirs?

A. Everyone—At that particular time?

Q. Yes, when they were found, right then.

A. No, no one said anything.

**Three other instances of alleged misconduct occurred during the prosecution's closing statement:**

I asked Detective Dawson, when you found the drugs, when you found them, what was the reaction of each of them? Was there any reaction? None. Common sense. Common sense. At that point, something is found that you have no knowledge about that is illegal. Common sense. Knowledge.

Involvement and agreement: "spoken or unspoken," as the instruction says. An agreement that they knew what was going on, and at that point, they were caught. It's all over, their faces when you saw them there, it's all over their actions, it's all over their conduct.

Later during the closing statement, the prosecutor added:

. . . the unrefuted evidence of this case is that over 60 grams of crack cocaine is found in a hotel room in which these four defendants were staying; unrefuted, uncontroverted, undenied, it is where the evidence was found, it is where all the officers have testified that it was found under—in a pillow case on a bed where Mr. Williams was sitting, the same bed that Mr. Stone had been on, a bed that Mr. Smith was on, that he admitted to Mr.—to Detective Dawson that he had been on; a jacket that the evidence was that that was the jacket that Mr. Carter was wearing, he had been wearing FUBU pants, FUBU shoes and a FUBU jacket. That's the evidence that you've heard.

Finally, the prosecution stated:

The search of that room clearly produced 60 grams of crack cocaine. Three individuals there; Mr. Stone, who's driving the van where crack is found; where Mr. Carter is using a fake I.D.; cell phone; scales; pager; all indicative of trafficking in drugs. That's unrefuted.

There's no speculation there. The evidence, common sense dictates that these individuals were here trafficking in cocaine, and that's what they were—and that's what happened and had been doing, and they were caught. And that's why they hung their head, and that's why there was no surprise, and that's the simple truth of the matter. I ask you to return a verdict of guilty on all the charges. Thank you.

 The prosecution's constant references to the defendants' decision to remain silent are improper, and violate the defendants' Fifth Amendment rights under *Griffin*, 380 U.S. at 613, *Doyle*, 426 U.S. at 611, and *Combs*, 205 F.3d at 281–283. However, the defendants failed to object to most of these statements, and thus have failed to preserve this claim for this court's review. In fact, it was the district court that suggested to the defendants that the prosecutor's statement about unrefuted evidence may be improper, and went so far as to offer to declare a mistrial over the prosecutor's conduct. The defendants indicated that they did not want a mistrial. The district court then issued a general cautionary instruction to the jury to consider only the evidence, and not the "lawyers' statements and arguments."

Waiver is the "intentional relinquishment or abandonment of a known right," and these rights are not reviewable. *See United States v. Aparco–Centeno*, 280 F.3d 1084, 1088 (6th Cir.2002) (quoting *United States v. Olano*, 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Like the defendant in *Aparco–Centeno*, the defendants here agreed with the district court's proposed course of conduct, and then later charged the court with error for that conduct. *Id.* (quoting *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990)). Furthermore, the defendants' counsel here dissuaded the district court

from following the most curative remedy of all—declaring a mistrial—and instead urged the district court to issue a curative instruction regarding the prosecution's comments. A decision whether or not to accept a mistrial falls firmly within the set of strategic decisions through which a counsel may bind her client, regardless of whether the client participates in that decision. *See Watkins v. Kassulke*, 90 F.3d 138, 143 (6th Cir.1996); *see generally* 3 W. LAFAVE & J. ISRAEL, CRIMINAL PROCEDURE § 11.6(a) n. 40 (1999). Because the decision of defendants' counsel to reject the offer for a mistrial is a legitimate strategic decision, their agreement with the district court's proposed course of conduct constitutes knowing waiver of this issue. *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

We therefore decline to review defendants' claims that the district court committed plain error by not declaring a mistrial following the prosecutor's decision to comment on the defendants' silence at arrest, their failure to present evidence, and their failure to testify in their own defense. The defendants' refusal of the court's offer to declare a mistrial constitutes waiver and thus bars any further relief. *See Fleming v. United States*, 332 F.2d 23, 25 (1st Cir. 1964).

**D. Whether the district court properly sentenced Carter, Smith, and Stone in accord with the mandate of *Apprendi* where the jury was not permitted to decide the amount of drugs named in each count of the indictment.**

### 1. STANDARD OF REVIEW

Where a defendant raises a cognizable *Apprendi* challenge in the district court, we review the *Apprendi* issue *de novo* for harmless error. *United States v. Humphrey*, 287 F.3d 422, 442 (6th Cir.2002);

*United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir.2001). Where a defendant fails to raise the issue in the district court, or abandons it on appeal, we review for plain error only. *Humphrey*, 287 F.3d at 442 (citing *United States v. Graham*, 275 F.3d 490, 521 (6th Cir.2001)). Under the plain error test of FED. R. CRIM. P. 52(b) for an error not raised at trial, an appellate court must find (1) error, (2) that is plain, and (3) that affects substantial rights before it is able to correct that error. *United States v. Cotton*, —— U.S. ——, ——, 122 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002) (citing *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), and *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). If all three of these conditions are met, " 'an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (citing *Johnson*, 520 U.S. at 467).

### 2. ANALYSIS

The defendants argue that they were not sentenced in accord with the mandate of *Apprendi* because the drug quantity was not alleged nor proved beyond a reasonable doubt. It is well-established that any fact that serves to enhance the sentence of a defendant, aside from prior convictions, must be found by the jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In federal prosecutions, such facts must also be charged in the indictment. *Id.* at 476. However, the "same cannot be said of a fact that increases the mandatory minimum (but not extending the sentence beyond the statutory maximum)," since the jury's verdict authorized the judge to impose the statutory

minimum irrespective of any findings she may make. *Harris v. United States,* —— U.S. ——, ——, 122 S.Ct. 2406, 2414, 153 L.Ed.2d 524, —— (2002) (Kennedy, J., writing for the Court in a four member plurality opinion, the holding of which is supported by a separate concurrence by Breyer, J.). Within the penalty range set by a jury's verdict, it does not violate the Constitution to require defendants to serve minimum terms based upon a judge's factual findings. *Id.* at 2419. This is because even the minimum term is within the range authorized by the jury's factual finding.

We find that Carter, Smith,[5] and Stone fail to present a viable *Apprendi* argument that we may recognize under the plain error test of *Cotton. See* —— U.S. at ——, 122 S.Ct. at 1785. In considering these claims, we first must analyze whether each defendant raised the *Apprendi* issue at the district court. None of the defendants objected to the failure to include drug quantity in the indictment for count three, nor made a contemporaneous objection to the jury instruction that allowed a finding of guilty—even for counts one and two of the indictment that did specify a drug quantity in excess of fifty grams—upon a finding of any "measurable amount of cocaine base." Carter and Smith failed to challenge either the indictment, the standard of review, or the fact that the determination was made by the district judge rather than by the jury. Stone made no drug quantity objection at all. This does not constitute an adequate objection to preserve the *Apprendi* issue on appeal. *Humphrey,* 287 F.3d at 444. We thus review the *Apprendi* violation for plain error. *Cotton,* —— U.S. at ——, 122 S.Ct. at 1785.

Next we look to whether an *Apprendi* violation occurred. Stone was convicted under counts one, two, and three, and was sentenced to life imprisonment under the third offender provision for each count. Carter was convicted under counts one and three, and was sentenced to 240 months based on his second offender status. Smith was convicted on count three only, and was sentenced to 121 months imprisonment. In the indictment for each count, only counts one and two named a drug quantity—"in excess of fifty (50) grams of a mixture or substance containing a detectable amount of cocaine base, that is, 'crack cocaine,' a Schedule II controlled substance." The indictment for count three contained no reference to drug quantity. The jury instructions specific to counts one and two made the same reference to "in excess of fifty (50) grams" of drug quantity, while the instructions specific to count three likewise omitted any reference to drug quantity. Following the three count-specific instructions, the district court also instructed the jury generally (Instruction No. 20) as to all three counts It stated:

> In the indictment, it is alleged that a particular amount or quantity of cocaine base (crack cocaine) was involved. The evidence in the case need not establish that the amount or quantity of cocaine base (crack cocaine) was as alleged in the indictment, but only that a measurable amount of cocaine base (crack cocaine) was in fact the subject of the acts charged.

The jury verdict forms listed each count with a box to mark whether each defendant was guilty or not guilty, without any finding of drug quantity on the verdict form. Given this combination of jury instructions and verdict forms, we can only assume that the jury made a finding be-

---

**5.** Smith does raise the *Apprendi* issue on appeal, contrary to the assertion of the United States. *See* Appellant Smith's Brief at 19 n. 2.

yond a reasonable doubt for each count consistent with Instruction No. 20, allowing "any measurable amount of cocaine base" rather than the "particular amount or quantity of cocaine base" as charged in the indictment. *See, e.g., United States v. Stokes,* 261 F.3d 496, 498–99 (4th Cir. 2001).

At sentencing, the district court raised an inference that it felt constrained to sentence the defendants within the higher statutory range of the mandatory minimum sentence required under § 841(b)(1)(A) rather than § 841(b)(1)(C). *See Strayhorn,* 250 F.3d at 470. The district court's drug quantity finding of sixty grams for each defendant increased Carter's sentence from a maximum term of thirty years' imprisonment under § 841(b)(1)(C) to a mandatory minimum sentence of twenty years' imprisonment under § 841(b)(1)(A). The district judge then sentenced Carter to the very bottom of the higher range, but within the maximum sentence of § 841(b)(1)(C). The same occurred for Smith—the district court's finding of sixty grams of drug quantity increased his sentence from a maximum of twenty years' imprisonment to a mandatory minimum sentence of ten years. Smith was sentenced to 121 months of imprisonment, again right at the minimum allowed under the applicable sentencing range, but also within the maximum sentence allowable under § 841(b)(1)(C). Stone's treatment is different, however. The finding of sixty grams of drug quantity increased his sentence from a maximum term of thirty years' imprisonment to a mandatory life sentence under § 841(b)(1)(A). Unlike the others, the district court's finding of drug quantity increased the maximum sentence to which Stone was exposed, and Stone was sentenced above the maximum sentence of § 841(b)(1)(C) pursuant to that finding.

The district court also stated at sentencing that it felt constrained to sentence each defendant within the higher statutory range. *See Strayhorn,* 250 F.3d at 470. For Carter, the district court noted:

All right. The Court has no discretion here. If the Court had discretion, the Court would sentence Mr. Carter to a substantially lesser sentence. But that is neither here nor there, because I don't have the authority.

The Congress has told me that I must sentence Mr. Carter to 240 months on each count to be served concurrently.

So, pursuant to the Sentencing Reform Act of 1984, that will be the judgment of the Court.

For Smith, evidence of the district court's perception of constraint was more ambiguous:

Well, I think a sentence at the low end of the guideline range is more than adequate here in this case.

The district court showed no ambiguity whatsoever regarding the constraint it felt with respect to Stone's sentence.

All right. I think oftentimes in this country we overreact to situations. I think the Congress has overreacted to the drug problems in this country. I can't imagine that it was the intent of Congress to sentence somebody like Mr. Stone, who is a minor player in the drug culture, to life imprisonment. I just can't imagine that that was the intent.

But, nevertheless, that is the law, and that's what I have to do. And I hope that the Congress will change the law. I hope they change the law, and I hope it will apply to Mr. Carter—or to Mr. Stone. And that's not beyond the realm of possibility, I think.

But,—so I am going to state the sentence now—and reluctantly state the sentence—wish I didn't have to do it. So pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant James A. Stone be committed to the custody of the Bureau of Prisons to be imprisoned for a term of life on Counts One, Two, and Three, to be served concurrently.

■ The United States is correct with regard to Carter and Smith when it argues that the defendants' sentences were within the statutory maximum for each offense, which does not violate the express mandate of *Apprendi.* *See* 530 U.S. 466 at 483 n. 10, 120 S.Ct. 2348, 147 L.Ed.2d 435. Even with no drug quantity specified, Carter would have been sentenced under § 841(b)(1)(C), which provides for a statutory maximum sentence of thirty years. His sentence of twenty years does not exceed this thirty-year statutory maximum. A similar argument applies for Smith—his sentence of just over ten years' imprisonment falls within the statutory maximum for their respective offenses and career offender levels under § 841(b)(1)(C) where no drug quantity finding is required. The Supreme Court recently clarified its jurisprudence in this area, noting that as long as a fact increases the statutory minimum but does not extend the sentence beyond the statutory maximum, then neither *Apprendi* nor the Constitution has been violated. *Harris,* — U.S. at —, 122 S.Ct. at 2419. This is the exact situation before us—the finding of sixty grams of drug quantity by the district court raised the mandatory minimum for each defendant, and the district court sentenced each defendant right at the mandatory minimum of the higher penalty range.[6] The fact that the district court felt constrained to sentence each defendant within the higher statutory range no longer implies an *Apprendi* violation under our case law. *Id.* Because the district court's factual finding of sixty grams of cocaine base did not extend the sentence of defendants Carter and Smith beyond the statutory maximum on the respective counts for which they were convicted, no *Apprendi* violation occurred. *Id.* With no *Apprendi* violation before us, Carter and Smith also fail to meet the first element of the plain error test, that an error occurred. *See Johnson,* 520 U.S. at 468; *Olano,* 507 U.S. at 733. Our plain error analysis ends here.

■ Stone's sentence of life imprisonment, however, does not implicate an increased mandatory minimum sentence, but rather an increased maximum sentence. Because of the district court's determination that sixty grams of cocaine base were involved, Stone was sentenced to life imprisonment under § 841(b)(1)(A), beyond the statutory maximum of thirty years in § 841(b)(1)(C). *Apprendi* requires that any fact that enhances the sentence in this manner must be found by the jury beyond a reasonable doubt. *Apprendi,* 530 U.S. at 483. Because Instruction No. 20 clearly informed the jury that they need not find the amount alleged in the indictment, "but that only a measurable amount of cocaine base (crack cocaine) was involved," the jury made no finding regarding drug quantity sufficient for the district court to sentence Stone beyond the thirty year maximum allowable for possessing "a measurable amount of cocaine base" under § 841(b)(1)(C). Accordingly, Stone's sen-

---

**6.** We do note that Instruction No. 20 did take the finding of drug quantity out of the province of the jury for counts one and two, and had the judge's finding of drug quantity extended the defendants' sentences beyond the statutory maximum on the respective counts for which they were convicted, the mandates of *Apprendi* would have been violated.

tence of life imprisonment violates *Apprendi*.

Having concluded that an *Apprendi* violation occurred with regard to Stone's sentence, and because the claim was waived in the district court, we must review the claim for plain error. *Cotton*, —— U.S. at ——, 122 S.Ct. at 1785. Our recent decision in *United States v. Norman Lee Harris* interprets the plain error test in *Cotton* as to preclude Stone's claim. *See United States v. Norman Lee Harris*, 293 F.3d 970, 974 (6th Cir.2002). Where the defendant fails to raise the *Apprendi* objection at trial, and where the drug amount used was in fact clearly shown, then enhancement of the sentence by the trial judge based on the amount of drugs does not seriously affect the fairness of the proceeding. *Id.* As such, Stone fails to meet the final prong of the plain error test of Rule 52(b)—that the plain error affecting substantial rights must also "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, —— U.S. at ——, 122 S.Ct. at 1786.

Accordingly, we affirm the district court's sentence for Carter, Smith, and Stone as in accord with the mandate of *Apprendi* and the United States Sentencing Guidelines.

### E. Whether the district court properly found that Carter and Smith were responsible for more than sixty grams of cocaine base.

#### 1. STANDARD OF REVIEW

We review the district court's determination of the quantity of drugs involved in the offense for clear error. *United States v. Walton*, 908 F.2d 1289, 1300–1301 (6th Cir.1990). The approximation will meet this clear error standard if it is supported by competent evidence in the record. *United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir.1995).

#### 2. ANALYSIS

■ Carter and Smith submit that the district court improperly found that each was responsible for more than sixty grams of cocaine base. A defendant who has been convicted of a conspiracy may be charged with all reasonably foreseeable acts and omissions in furtherance of that conspiracy. *United States v. Neuhausser*, 241 F.3d 460, 475 (6th Cir.2001) (citing *United States v. Critton*, 43 F.3d 1089, 1098–99 (6th Cir.1995)). This includes attributing all those involved in the conspiracy with the same quantity of drugs. *Id.* However, this attribution process should not be mechanical. *See United States v. Meacham*, 27 F.3d 214, 217 (6th Cir.1994); *see also United States v. Milledge*, 109 F.3d 312, 316 (6th Cir.1997). The trial court must make individualized findings for each member of the conspiracy, regarding the scope of the conspiracy and the duration and nature of each conspirator's participation. *United States v. Bingham*, 81 F.3d 617, 624 (6th Cir.1996).

The district court properly made individualized findings for each member of the conspiracy sufficient to survive our clear error review regarding the quantity of drugs attributed to Carter and Smith.

Regarding Carter, the district court found:

> The testimony at trial established that Mr. Carter met the other defendants at the New Circle Inn on Friday. Prior to the arrest they ate and drank together throughout the weekend.

> On Sunday morning Mr. Carter registered for a motel room at the Days Inn under his brother's name using his brother's identification and paid for the room with money which he received from James Stone.

> All six members, or all six of those indicted, stayed in the Days Inn Motel

room on Sunday. Throughout the day members of the group left and returned. Early Monday morning police officers found Mr. Carter in the motel room, which contained digital scales, plastic bags, cigar blunting material, an iron, and all in plain view; as well as approximately 60 grams of crack cocaine, over $2,000 in currency, cell phone, pager, ammunition, glass measuring cup, and a notebook containing a recipe for crack cocaine.

So based on what I have just said, based on the testimony which I heard at trial, the Court would find that Mr. Carter engaged in a jointly undertaken criminal activity; that is, conspiracy to possess, and aiding and abetting, and possession of crack cocaine with the intent to distribute.

The possession of the entire amount of the crack cocaine in the motel room was in furtherance of that jointly undertaken criminal activity and was reasonably foreseeable to Mr. Carter in connection with that activity.

Considering Mr. Carter's role in obtaining a motel room, his contacts with the other defendants throughout the weekend, and the close quarters shared by the defendants, the Court finds sufficient evidence to sentence Mr. Carter based on the entire amount of drugs found in the motel room.

Regarding Smith, the district court stated:

At trial Leah Hicks and Yolanda Parker testified that they traveled to Lexington, Kentucky from Michigan with Mr. Stone and Mr. Smith in Mr. Smith's van.

Upon arriving in Lexington, they met Mr. Carter and Raymond Williams and other individuals at the New Circle Inn ... Throughout the weekend the group met and ate and spent time together. Mr. Smith allowed others to use his van.

On Sunday morning the group moved to Day's Inn where they checked into one room.

And early Monday morning the police found Mr. Smith in the motel room, which contained digital scales, plastic bags, a cigar butt, and materials in plain view, and about $2,000 in currency, and over 60 grams of crack cocaine; found a cell phone, pager ammunition, measuring cup, and a notebook containing a recipe for crack cocaine.

In a statement to the police, Mr. Smith stated that he had never left the motel room that evening. And he acknowledged that he recognized crack cocaine, and he knew that digital scales were used to weigh drugs.

The Court then would find that Mr. Smith and the other defendants engaged in a jointly undertaken criminal activity, specifically with regard to Mr. Smith aiding and abetting, possession of crack cocaine with intent to distribute.

The possession of the entire amount of crack cocaine found in the motel room was in furtherance of the jointly undertaken criminal activity, and it was reasonably foreseeable for Mr. Smith in connection with that activity.

Considering the fact that Mr. Smith maintained almost constant contact with the other defendants throughout the weekend and shared close quarters with the other defendants, the Court finds sufficient evidence to sentence Mr. Smith based on the entire amount of drugs found in the hotel room.

These individualized findings for Carter and Smith fulfill the mandate of *Meacham* and *Bingham* to analyze the scope, duration, and nature of each defendant's participation, *see Meacham*, 27 F.3d at 217; *see also Milledge*, 109 F.3d at 316, and are supported by enough competent evidence in the record to meet our clear error re-

354

view of the district court's determination. *Mahaffey*, 53 F.3d at 132.

Accordingly, we affirm the district court's decision to find both Carter and Smith responsible for more than sixty grams of cocaine base at sentencing.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.